May it please the Court, Jay Carroll on behalf of Appellants. Greetings from Yakima, the other Washington. We are here today on cross-motions for summary judgment, and obviously I am here because our motion for summary judgment was denied. The issue ultimately comes down in this contract interpretation case to whether there is an ambiguity within the contract itself, and if there is an ambiguity, is it resolved or has it been resolved by virtue of result to the construction rules that are there. This is an IDIQ contract, and it is important for everyone to remember that there are three different types of contracts that could be at issue here. Now, what is your position? Was there an ambiguity or not? No. You're saying it's clear, and you're basing that on Appendix 376? Pardon your honor? What number are you pointing us to that says that there was no ambiguity, this was the money to it? The task order 112 says on six separate occasions that it is for the $483,061. And on those occasions, that number is followed by the letters EST? EST. Correct. Which goes to the concept of this is an IDIQ contract. It is indefinite as to quantity and indefinite as to, it is the subject of that contract is an estimate. It is subject to change. If you look at the case law that we cited through your honors with respect to what an And that's what takes it out of the concept of being an illusory contract. There has to be a minimum level there, otherwise it is an illusory contract. This is a contract that EVs entered into with respect to feeding troops. And as the record demonstrates, it is, and I believe the quote is from Chief Gibson, a fluid process. Because you have, in this case, second chemical battalion from down south who is coming in to do a training exercise. And they were going to be there for a month and a half. And so you never knew your troops on the ground, which battalions were going to, or which units were going to be there. It's a fluid process. And that's why we cited to your honors the concept of how task order 110 worked. There were 111 task orders before task order 112, which is why we're here today. And they all worked the same way. And that is, in the task order itself, which was the implementation of the overriding parent contract, the IDIQ, there was, within the CLIN section, set forth the specific number of breakfasts, lunch, and dinners. And yes, there were estimates. It then had a unit price. And that was a firm, fixed price. That was not subject to change. So under unit price, it was a firm, fixed price. And if it was a breakfast, a lunch, or a dinner, it would be at the, I don't remember exactly, $7.77. What could change was the units. That's how many breakfasts. Okay, what I'm a little confused about, I'm looking at Appendix 376. Correct. And it says, item 1, quantity 1, each, unit price $483,000. Correct. Well, it can't be $483,000 for one breakfast. You are correct. And that's why this was an unusual task order. As a matter of fact, it was the only one. When I asked Sergeant Gibson about, because it says unit 1, unit price $483,000, it is not broken down. That's why, in the record, when EV's employees saw this task order that had eventually been issued, he called the Washington Guard, who he thought was his court, Sergeant DeGroff, I believe, and said, am I reading this right? Unit 1, unit price $486,000. And the response to that was, say thank you, Sergeant DeGroff. The employee called because, you're absolutely right, Your Honor, this was absolutely out of the norm. This was unusual. We submitted to you a deposition testimony from Chief Officer Gibson. Because I asked him in his deposition, is this normal? When do you see this? His response was, this was unusual, which it was. And in response to that, he said, you see this when it's one of those 11th hour things, where you're going to get troops on the ground, and you have to have a funding mechanism, otherwise those troops aren't going to get fed. Yeah, but the attachments go very specifically and use the number you suggested, which is 774, right? The attachments that come up with the 300 whatever, the number that you pay. Yeah, the attachments come down because they are referenced in the actual task order 112 as being the daily meal breakdowns. It doesn't say, this is what you're going to be paid. It is for daily meal breakdown, which is, again, a usual procedure because there's logistics involved. EVs doesn't just get normally a number. They have to have a number of troops. That's going to be the target for them. So why aren't those attachments more profitable than the overall number, which you say makes no sense because it talks about 483,000 per unit. It actually does make sense because, again, remember the process in this case was that this task order started out as a direct acquisition contract because 2nd Camp Battalion was going to do an exercise in Yakima and had come to EVs to say, hey, can you provide us meal services? They then said, you need to talk to the Washington National Guard people and fund this as a member. I'm learning a lot of anachronisms here, but it's just a funding mechanism. It's so that you can use the IDIQ contract. Washington National Guard said, no. We don't have the resources to be able to observe and watch out for this contract, and therefore, we're not going to allow you to use our IDIQ contract. EVs protested. Washington Guard stuck to their choice. So at that point in time, the employees from EVs went to a direct acquisition contract with 2nd Camp Battalion. And that's where this number of 483,061 comes from because if you look at, and it's Appendix 508 through 511, that was the email's exchange like two weeks before this task order was eventually issued. And in that, it specifically has the, you'll see 1,100 troops because that's what it was based on. The employee at EVs ran his direct acquisition numbers and contract in the form of a task order. And so that's the number. That's where it comes from is $483,061 on the direct acquisition contract. That's what was submitted to 2nd Camp Battalion. That exact number is the one that's used on Task Order 112. And it says Unit 1, Unit Price, $483,061. In the context of how this all came together, it makes perfect sense. And it does say Unit 1, Unit Price, and it doesn't say Unit Price Estimate. It says Unit Price, 483,061 because that's the firm fixed price. It is unusual. It is. If there is, and I'm going to delve into the ambiguity part because I think my clock, I think I'm running out of time. I reserved five minutes. Does it say that I did? Yes, it does. And the clock will turn yellow in 43 seconds. Oh, okay. I just wanted to touch very briefly on the ambiguity part because the contra pro forentum, sorry if my Latin's bad, but that concept applies here. And even if there was some sort of patent ambiguity, which we don't think applies here because this is not a bid solicitation or a contract solicitation claim. Therefore, it is not a situation where that concept applies. If it did apply, all that needs to happen is a seeking of clarification. And EV sought clarification in this case. They sought clarification by calling Sergeant DeGroff who said, just say thank you. They also sought clarification because the 2nd Chem Battalion was acting as the core and they asked on several occasions, do you want to modify the contract down from the 1100 that it was based on? And they were told in no uncertain terms, no. So clarification was sought and also the FAR on the order of precedence or preference again has been met in this case because the attachments which is what the government relies upon were the number 8 or number 9 on that regulation. Thank you, Your Honor. Good morning. May it please the court. There are two categories of contract interpretation issues that support the trial court's entry of summary judgment in this case. The first being global issues or in some of the language that you've already been speaking with the appellant's counsel about and then the second category are specific interpretative flaws with the appellant's argument. I'm going to start with the global issues which in addition to page 376 of the appendix the trial court's analysis really began on page 374 of the appendix which in box 26 identifies the total award amount and then again is $483,061 EST. And then that box then cascades down to page 376 of the appendix that you were speaking with the appellant's counsel about. What the trial court did is they looked at the litany of cases that have defined what EST and what estimate mean and what they found is that that term unambiguously communicates a non-binding commitment. Can I ask you about that though? On 376 that number appears the $483,000 appears four times right? Yes. And in two out of the four there's no EST. Right. And ma'am there's actually a structural explanation for that. So the very bottom number that you see the bottom the fourth one in your scenario the bottom one that represents the fact that as Mr. Carroll alluded to these funds had been wired over from the active duty to the guard that line entry there represents that that is the amount that's been wired over to the guard. Then the other, the top line of this where we see all the way to the right the $483,061 EST that's the product of the multiplication that's occurring to the left of that. So by the operation of the rules of grammar because we know that the product of that multiplication is an estimate and therefore the multipliers that precede it are also by definition estimates. No, not both of them, right? Let's, it only means one of them would be an estimate. Why wouldn't it be quantity? Because that's the way in every indefinite quantity contract, which is what this is. Exactly, ma'am. I think that's right. You could read One of them is fixed and one is an estimate. At least one of them needs to be an estimate and potentially both of them could be. You're absolutely right. And I think the fair way to read this is And unit price is never an estimate. If you look at all the other task orders, it's $6.70 for breakfast $9.12 for dinner That doesn't seem to be something that anyone has ever suggested is in fact an estimate. That seems to be the fix. The fixed price. Well, yes. And if you take that quantity one, what that is describing is the entirety of the last three pages of this task order. The five weeks' worth of data that is contained there. And the reason why it ended up there as opposed to where you might normally see which was right underneath the data line that we're talking about is because I don't understand how you're trying to rationalize this as opposed to saying at 11 o'clock at night the guy must have been drunk when he wrote it. I don't see how it makes any sense. This task order makes no sense to me in that I get your EST argument. Totally with you. I understand when EST is used in a definite quantity contract. It's because you're saying we don't know exactly what the quantity we're going to ultimately need is and thus the overall number is purely an estimate. But it just seems that this quantity one unit price 483 is just a mess up. But you're trying to rationalize it to me when it doesn't make any sense and I'm not buying your rationalization. I think it certainly could have been written in a more clear fashion with respect to what that quantity pertains to. But then when you go down to the next line and it directs you to the last three pages of this task order, you have the myriad of details that apply to this exercise. I recognize it certainly could have been done a different way. I think in this circumstance it's an efficiency act that led them to do it this way rather than deconstructing those three spreadsheets that you see into potentially 200 pages of specific entries that follow. I think that certainly could have been done a different way. That's the rationale that they had for doing it this way. It's just a more efficient way to convey a significant amount of information and it helps to think about what the scope of this arrangement was. This is a tiny guard base, a tiny guard unit, and a tiny contractor. Typically they were providing services over a drill weekend, which is a Saturday and Sunday, three meals a day. That level of information can easily be conveyed in what we're looking at on Appendix 376. For the first time during the life of this contract you had an outside unit come to the training facility and want to use not only the field where the training could happen but some of the contracts. None of that has anything to do with how I interpret one, which is a quantity which is supposed to be indefinite in nature and the fixed unit price, which in every other contract of this kind is a fixed price and it's usually articulated on a per meal basis. I think it helps to go back to the IDIQ contract to figure out what we're talking about. This relates to some of the specific interpretive flaws that I've noted in the appellant's argument. Did they provide one? Did they provide one? One. The quantity asked for it's one. Estimated you will need one. Did they provide one? They provided the exact number of meals that were listed in the last three pages of Task Order 112. The breakfast, lunch, and dinner breakdown for each day, that is what they provided. If you roll that all up into the quantity of one, then that is Then they provided one. They did. If they provided one that's the estimate. The fixed price under unit price is $483,000 so why don't they get $483,000 if they provided one? Because the IDIQ contract defines unit as meals. Per the IDIQ contract meals will be Where does it define units as meals? 322 of the appendix says meals shall be provided to customers at fixed prices. Where does the Task Order say that units are meals? The Task Order incorporates the terms of the IDIQ contract and per the IDIQ contract, in the event that it conflicts with the Task Order, the IDIQ contract prevails. So even if we were to adjust the unit that we're discussing here from a specific meal to a specific time period, that would create a conflict between the IDIQ contract and Task Order 112. In the IDIQ contract Where does the IDIQ contract I'm at 322, where does it say that the units are meals? Under summary of services in the second sentence meals shall be provided to customers at fixed prices negotiated by the USPFO for Washington. And they provided meals at fixed prices you know I just look your good argument is that it says estimates throughout and that that's got to prevail. Your bad argument is I can see no rational explanation for this quantity one unit price 483. It makes absolutely no sense. It's clearly just a mess up. It is not something that I want to encourage people to do for quote efficiency reasons as you started to suggest this would serve. Well I'm certainly not venturing to encourage anyone to draft a contract like this. What I'm telling you is the rationalization that they had at the time that they were drafting this. And the way the trial court resolved that is noting that the undisputed definition of what estimate means and then the clarification that's provided in the last three pages of task order 112 and knowing that the meal, the price per meal is fixed. The ultimate result of that higher number is to cover the potentiality of. Well isn't like, wouldn't a good argument if I was going to try to find some way to live with quantity one unit 483 be quantity as always in an indefinite quantity contract. So maybe they only provided .73 based on everything that follows in the spreadsheet or something. To my earlier point that's my reading of this quantity one is that when I say it's informed by the data entry that's in the last three pages of task order 112 that rolls up into that one. So they did provide all. See that can't roll up into the one. That can't be what constitutes one because if it is then they're supposed to get a unit price of 483,000. Well no because the 483,000 is marked clearly as an estimate. No the total is marked as an estimate based on the notion of an indefinite quantity. But if in this case they provided one the price they're supposed to get for one is not indefinite. Well no I think you have to read the contract in its entirety which is not only the page that we're focused on but the three pages of detail that follow that inform what we're reading. So right underneath the single line that we're talking about it directs the parties to these last three pages which then have the level of detail provided. We know from the contracting officer's deposition which is at page 422 of the appendix. The reason that 483, that higher number remained there was because that's the number that was wired over from the active duty side and to cover them in the event that there was a need for more. Exactly. I get it. That's why it's an estimate. But why does it have a 483 under the unit price? It's got to be just a screw up. We know the origination of that number and that number came from the initial negotiations between the contractor and an outside agency. So that's where that number originated. And then in the months after those original negotiations happened. What is it the unit price for? What unit costs $483,000? I don't think you can read this line here to answer that question. What can I read to answer that question? What unit is the government agreeing to pay $483,000 for one of them? I don't think that's how this is to be read. Because we know that the unit of measure for this contract is meals. So then we have to read that next line underneath it that directs us to look at these other three pages. To read it otherwise would create a conflict between the two documents. And in that case then the IDIQ contract would prevail. There is a secondary or a second argument that the appellant had with respect to modification. Whether or not this $483,000 number became locked in because the task order was never modified. Again, referring back to the IDIQ contract at page 323 of the appendix, that provides that if the meals requested change, a task order modification is required. What we have here is the actual number of meals requested never changed. They were the identical numbers that were provided five days before any party executed this contract. That's exactly what the active duty units needed. Those were the number of meals provided and ultimately that was the compensation that was paid to the contractor. What about your friend's arguments with respect to the clarification that his client sought and did not receive? That goes to whether or not ambiguity exists. And if we disregard all the EST notations and then we disregard the last three pages of the task order, we end up with an ambiguity. You end up with an ambiguity if the contract overall contradicts in other places all of that other stuff. That's exactly right. You don't have to disregard it, you just have to weigh it against other aspects of the contract and decide if there's confusion. We know what estimate means as a matter of law. My point would be to get to that ambiguity, you'd have to disregard that. The end result being that there is an ambiguity within this contract. The requirement to see clarification is pretty clear in this case because there was an obvious question that would have immediately resolved all of this. How much am I getting paid for this contract? When you look at the appendix and the deposition of the 30B6 representative from the contractor, he said he immediately noticed, his words were right off the bat, he noticed the potential for confusion and he didn't bring up the issue. What he did bring up were two questions, both directed to the wrong people and both not going directly to the issue. One being the appellant's counsel acknowledged they directed that to a person who was in the guard but not the contracting officer representative and as the contracting officer noted in his decision, that was a person with absolutely no authority directed with respect to this contract. In any event, the formatting questions... I know you went on that argument, but it is a certainly frustrating argument, right? You have a little caterer like Evie's that is serving our troops in a meaningful and useful capacity and the idea that the person within the government that answered the question in a favorable way to them had apparent but not actual authority and therefore they can't get any money. I understand you went on it. I understand the law is the law, but it sure isn't very palatable for small companies like this that are seeking to serve their government. And ma'am, I don't disagree with you, but the flip side of that is when you receive a contract like this five days before you sign it and you tell me that you noticed the potential for confusion right off the bat and you didn't bring it up, you didn't ask... The bottom line is this... We didn't have to be here. This was a very easy dispute to resolve because they asked that question, what am I getting paid? And they're told the answer and they're either happy with it or they're not and that can be dealt with immediately and we're not in litigation. That's the whole point of this clarification and what we know from the Dalton v. Cessna case is that if you ask these vague questions, if you ask questions that are not getting to the heart of the issue, you need to ask follow-up questions. And I can't imagine a scenario where there's a more obvious question to ask. My first take at this contract was, why didn't you just ask that? We could have resolved all of this. And if you look at the contracting officer even said, if that had come up, we could have resolved this. And then even on the back side, if they didn't have been able to provide information... Who was it that said this is a gift? Well, it's a person named Sergeant Groff, and I know I'm getting close to my time, but it's a person who is no longer employed with the government in any capacity. He was never deposed from this case, never spoken with, he had no authority on this contract. But what the appellant's point is, what he said is, be thankful for this contract or something like that. And if I may, I think there's a common sense answer to that, which is, as I noted, this is a small base, a small unit, and a small contractor. This arrival of this active duty unit allowed them in one month, even at the 317,000 number, allowed a year. That is what I think he was referring to there, is that you've been only working on the weekends for this small guard unit, and now all of a sudden you've got this fantastic opportunity. Be thankful for that. I think that's the common sense way to read that. But in any event, that person wasn't involved with the administration of this contract. So, thank you very much. Thank you. Thank you. You may have pleased the court. Sorry, this will be scattered, but last point first. I don't think there's any evidence in the record that this was as much as they would make an entire year, and I don't know if that's relevant, but it's just yes, EVs is a smaller entity, but if you look at even task order 110, it's for a significant amount of money. The two key points that I want to make is, number one, in order to change the quantity 1 for 83061, Judge Moore, you're right. I mean, this is a situation where you have to take that 1 and then go .73. Actually, I wrote that down before you said it. But you have to use a decimal point in order to make that be a  The other problem is that line, I can find ambiguity in the contract, and the contract uses the word estimate six times next to the 483, and then also it includes a detailed spreadsheet, and I think that that line is clearly an unintentional screw-up, but that doesn't create necessarily ambiguity if the whole rest of the contract informs everybody of what the deal actually was. And so that's kind of, to be honest with you, where I'm at on your case. I just feel like I'm not going to hide the ball from you. You know, I kind of think the rest of the contract informs everybody with clarity of what they were really agreeing to, even though that line makes no sense. But the notation that is there, which is on 376, says that those spreadsheets are daily meal breakdowns. The $317,000 number that they paid appears nowhere. I know, you have to add them all up. I read all of your briefs, trust me. And the clarification that needs to be sought, if indeed, because I don't, respectfully, I don't think you can look at this and say there isn't some sort of dialogue that we're having. I still think it's clear, and that is my argument. But if there is an ambiguity, all that had to be done, and it isn't that you have to resolve the dispute, you just have to seek clarification. So the fact that our representative called and spoke to Sergeant DeGroff, and then maybe he didn't have the actual authority, did they seek clarification? The answer is yes. Did they seek clarification by asking for a modification? Asking Second Kim, do you want to modify this contract? Not just once, but on several different occasions. In order to change that one to a .73, that takes a modification. EVs, through its representative, asked Second Kim, do you want to modify the contract? And they were told, no, there's too many missing or moving parts. We don't know from time to time what's going to happen in this case. And that's the nature of these types of exercises. Had there been a modification done, again, that's why Task Order 110, which is not at issue here, is important. There's a process you go through, and it's a process that EVs was familiar with, and had no problem going down. That was not a process that was invoked in this case. Therefore, we request that the decision from the court be reversed, and that actually EVs be granted judgment in this case. Thank you. We thank both sides, and the case is submitted. Next case for argument is